655 P.2d 938

Virgil NORWOOD and Ardith Norwood, husband and wife, Arthur Allen and Jane Audrey Allen, husband and wife, James F. Lettman and Shirley C. Lettman, husband and wife, Mrs. Francis Kyte, a single person, John E. McGraw and Lois L. McGraw, husband and wife, Tom Rogers and Rebecca Rogers, husband and wife, and Ernst Mac Billiard and Janet L. Billiard, husband and wife, Plaintiffs-Appellants,

v.

Raleigh STEVENS and Virginia Stevens, husband and wife, and John Doe I Through John Doe X, and Unknown Heirs and Devisees of Raleigh Stevens, Virginia Stevens and John Doe I Through John Doe X and all unknown persons claiming any right, title, estate, lien or interest in the south 21 feet and the west 59 feet of the northeast ¼ of the northeast ¼ of section 13, township 7 south, range 13 east of the Boise Meridian in Gooding County, Idaho, adverse to plaintiffs' ownership or cloud upon plaintiffs' title thereto, Defendants-Respondents.

No. 13813.

Court of Appeals of Idaho.

Dec. 21, 1982.

Frank J. Dykas, Weaver & Dykas, Buhl, for plaintiffs-appellants.

Gary W. Shaw, Gooding, for defendants-respondents.

BURNETT, Judge.

Here we encounter two groups of landowners whose properties long have shared a

common boundary, but who now dispute the location of the line. The Norwood group asserts that the boundary was established by Virgil Norwood and Raleigh Stevens when they and their spouses were sole owners of the properties. In 1960, Norwood and Stevens orally agreed that the true boundary was located along a fence line. In 1965 they rebuilt the fence in the same location, in reliance upon a survey which appeared to confirm the line. The Norwood group also urges, in the alternative, that this line was established by adverse possession. However, the Stevens group contends that the boundary should conform to a different line disclosed by more recent surveys, conducted in 1973 and 1974. The district court held that the boundary established by oral agreement was invalid, and that the elements of adverse possession had not been shown. Summary judgment was entered for the Stevens group. We reverse.

The facts in this case are uncontroverted. Our task on appeal is to decide whether the district court properly determined which group of landowners was entitled to prevail as a matter of law. I.R.C.P. 56(c). Our analysis of the boundary established by agreement makes it unnecessary for us to reach the contention of adverse possession.

■ In every case where a boundary by agreement is asserted, the underlying issue is whether such an agreement represents an oral conveyance of land in violation of the statute of frauds. *See* I.C. §§ 9–505(5), 55–601. The general rule of case law is that an agreement which arises from *uncertainty* or *dispute* over the location of a boundary is valid, and does not constitute an oral conveyance of land. *E.g., Hyde v. Lawson,* 94 Idaho 886, 499 P.2d 1242 (1972), *overruled on other grounds, Nesbitt v. Wolfkiel,* 100 Idaho 396, 399 n. 2, 598 P.2d 1046, 1049 n. 2 (1979). In the present case we must decide how this general rule should be applied where the landowners at the time of agreement believed they knew—but are later shown not to have known—where the true line was located.

There is no contention that Norwood and Stevens disputed the boundary in 1960 or 1965. The question is narrowed to whether they were uncertain about it. This question is more easily asked than answered. Our Supreme Court has given ambivalent signals as to whether an unknown boundary line is also "uncertain." In *Downing v. Boehringer,* 82 Idaho 52, 349 P.2d 306 (1960), the court said:

> Where the location of a true boundary line between coterminous owners is *known* to either of the parties, *or is not uncertain,* and is not in dispute, an oral agreement between them purporting to establish another line as the boundary ... is invalid. But, where the location of the true boundary line is *unknown* to either of the parties, *and is uncertain* or in dispute, such coterminous owners may orally agree upon a boundary line. When such an agreement is executed and actual possession is taken under it, the parties and those claiming under them are bound thereby. [82 Idaho at 56, 349 P.2d at 308. Emphasis supplied.]

From this language it might be inferred that an "unknown" boundary is something different from an "uncertain" one. However, the court in *Downing* also quoted with approval from a California decision:

> [An] agreement to fix a boundary line is not valid, indeed is void, if the parties *know, or one of them knows,* that the agreed line is not the true line, or, *in other words,* if there be not an actual or believed *uncertainty* as to the true line. [Emphasis supplied.]

*Clapp v. Churchill,* 130 P. 1061, 1062–63 (Cal.1913); *Downing,* 82 Idaho at 57, 349 P.2d at 308–09. This language essentially equates an "uncertain" boundary with one which is "unknown" to both parties.

It has devolved upon us, in this case, to choose between the ambivalent usages of uncertainty. It is not a simple matter of dictionary definition. "Uncertain" carries multiple meanings, one of which may refer to something "not known ... beyond doubt." Webster's Third International Dic-

tionary 2484 (1976). Moreover, this is not a rigid issue of statutory construction. We are dealing with a rule of case law, created by the courts. Our search for the meaning of uncertainty takes us into the history and development of the rule of boundary by agreement.

In *Idaho Land Co. v. Parsons,* 3 Idaho 450, 31 P. 791 (1892), our Supreme Court first held that when owners of coterminous properties establish a boundary line, thereafter taking possession and improving the ground up to that line, it would be binding upon them and their successors. The court did not specifically base its holding upon any single theory. Such disparate concepts as boundary by agreement, adverse possession, and estoppel were mentioned. However, the court relied heavily upon *Quick v. Nitschelm,* reported as *Quick v. Butler,* 139 Ill. 251, 28 N.E. 926 (1891). In that case the Illinois Supreme Court adverted to boundary by oral agreement, and said:

> *In most of the cases* when the rule has been held to apply, there has been no question as to the authority of the parties making such verbal agreement. There has been a dispute, *or at any rate an uncertainty,* as to the true location of the boundary line, so that the agreement operates as a settlement of what was unsettled. [28 N.E. at 929. Emphasis supplied.]

Thus, when the concept of boundary by agreement was introduced in Idaho, it was recognized ordinarily to apply—but was not entirely limited to—cases where location of the true line was uncertain or disputed.

After the turn of the century, our Supreme Court added a new dimension by making a strong policy statement in favor of recognizing boundaries long established by owners and marked by fences or other monuments. In *Bayhouse v. Urquides,* 17 Idaho 286, 105 P. 1066 (1909), the court applied the doctrine of adverse possession to sustain a fence line established for more than forty years. The court adjoined a second reason for its decision:

> Landmarks, such as fences, maintained for nearly half a century, coupled with actual occupation for forty years, ought not to be disturbed at the instance of one who has acquiesced therein for the same period of time .... Long acquiescence ought to also preclude a controversy that will involve rights that have been unquestioned for a generation. [17 Idaho at 298, 105 P. at 1069.]

Nothing in this doctrine of acquiescence required a showing of dispute or uncertainty concerning the true line. In fact, *Bayhouse* recognized that acquiescence could follow from a mutual mistake. *Bayhouse* left unclear the relationship between boundary by agreement and acquiescence.

A partial link between these concepts was forged in *O'Malley v. Jones,* 46 Idaho 137, 266 P. 797 (1928). In that case the Supreme Court held that the existence of an agreement relating to a boundary could be established by direct evidence, or could be inferred from the conduct of the parties or their predecessors—including long acquiescence in an existing fence line. *See also Kesler v. Ellis,* 47 Idaho 740, 278 P. 366 (1929).

This partial link between acquiescence and boundary by agreement seemed to illustrate that such an agreement need not always flow from a dispute or uncertainty. In *Woll v. Costella,* 59 Idaho 569, 85 P.2d 679 (1938), the Supreme Court, referring both to acquiescence and to an agreement, upheld a boundary fixed by a fence line. The court found it unnecessary to state, as a requisite of its holding, whether the agreement relating to the fence had arisen from a dispute or uncertainty. In *Strahorn v. Ellis,* 66 Idaho 572, 165 P.2d 294 (1945), the court followed the same pattern.

However, in *Beneficial Life Ins. Co. v. Wakamatsu,* 75 Idaho 232, 270 P.2d 830 (1954), the Supreme Court deviated from this pattern. Although *Wakamatsu* fundamentally was an adverse possession case, the court said in dictum that an oral agreement determining a boundary line must

arise from a dispute or uncertainty. Regarding acquiescence, the court stated:

> From the long existence and recognition of the original fence as the boundary, and the want of any evidence as to the manner or circumstances of its original location, the law *presumes* that it was originally located as a *boundary by agreement because of uncertainty or dispute* as to the true line.... Moreover, this long continued possession ... coupled with ... complete dominion and open and visible acts of ownership, gives rise to the *presumption* that ... [the] possession was *adverse.* [75 Idaho at 241, 270 P.2d at 835. Emphasis supplied.]

The court's opinion did not explain how the same facts could support conflicting presumptions of agreement and adversity.[1] Nor did the opinion state why acquiescence should be viewed necessarily to support a presumption of dispute or uncertainty. The suggestion in *Bayhouse,* that acquiescence could arise from a mistake, apparently was disregarded. In any event, the *Wakamatsu* dictum created doubt as to whether an oral boundary agreement, accompanied by fencing and acquiescence, would be upheld if the "presumption" of uncertainty or dispute were overcome by proof that the agreement reflected a shared, though mistaken, belief on where the true line was located.

From the shadow of *Wakamatsu* emerged the Supreme Court's decision in *Boehringer v. Downing, supra*—the case which prompted our historical survey. Having come full circle, we now can see the significance of the ambivalent signals in *Downing.* It is, simply, that the Supreme Court declined to perpetuate the narrower dictum of *Wakamatsu.* The court reverted to a broader, less precise view of oral boundary agreements.

Our survey has disclosed that, historically, decisions upholding oral boundary agreements have not been restricted to cases characterized by dispute or uncertainty. Where agreements have derived from ignorance or mistake, they nevertheless appear to have been sustained when accompanied by long acquiescence, construction of a fence or other monument, and possession up to the recognized line.

■ Decisions since *Downing* have continued to recognize that valid oral agreements may be founded upon unknown lines. In *Fry v. Smith,* 91 Idaho 740, 430 P.2d 486 (1967), the Supreme Court disallowed a boundary line established merely for convenience, when the true line actually was known to the property owners. However, the court implied that such an agreement would have been valid if the true line had been "unknown, uncertain or doubtful." 91 Idaho at 742, 430 P.2d at 488. Most recently, in *Gameson v. Remer,* 96 Idaho 789, 537 P.2d 631 (1975), the court said that the oral agreement doctrine "rests fundamentally upon uncertainty concerning location of the true boundary," and that the doctrine is inapplicable where "the record clearly indicates that true boundaries were known." 96 Idaho at 791, 537 P.2d at 633. We conclude that Idaho case law, presently and historically, would permit application of the oral agreement doctrine where the location of the true line is unknown to both property owners—even though they may not entertain uncertain or disputatious feelings about it.

This conclusion is consistent with California cases following the decision in *Clapp v. Churchill, supra,* which our Supreme Court quoted with approval in *Downing.* In *Nusbickel v. Stevens Ranch Co.,* 187 Cal. 15, 200 P. 651 (1921), "uncertainty" was held to mean "that at the time of the location of the [orally agreed] division line neither of the coterminous owners knew the true position of the line on the ground." 200 P. at 653. The term "uncertainty" was applied in *Nusbickel* to a situation where—as in the

---

1. In some circumstances consensual possession may be deemed "adverse" under I.C. § 5–209. *Lisher v. Krasselt,* 94 Idaho 513, 492 P.2d 52 (1972). However, the *Wakamatsu* decision spoke of evidentiary presumptions, and did not discuss application of § 5–209 in this context.

instant case—a fence was constructed by agreement at a location indicated by a survey later found apparently to be in error. *See also Ernie v. Trinity Lutheran Church,* 51 Cal.2d 702, 336 P.2d 525 (1959).

We believe the same result should obtain here. Norwood and Stevens did not, in fact, know the true position of the boundary line on the ground. They memorialized their agreement by constructing, and later rebuilding, a fence. They possessed the lands up to the fence, and acquiesced in the recognized line, for more than a decade.

The doctrine of boundary by agreement promotes practical and stable boundaries, while concurrently preventing property owners from engaging in oral transactions to convey land. These purposes are adequately served, and in no way diminished, by upholding an agreement to establish a boundary when the true location of the line on the ground is unknown to both parties. Accordingly, we hold in this case that the line marked by the fence constructed in 1960, and rebuilt in 1965, constitutes the lawful boundary between the coterminous boundaries.

The judgment of the district court is reversed; and the cause is remanded for entry of judgment for appellants—the Norwood group. Costs to appellants. No attorney fees on appeal.

WALTERS, C.J., and SWANSTROM, J., concur.